# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE, )
)
v. ) I.D. No. 1609000740
)
JOHN A. TUCKER, )
)
Defendant. )

Submitted: September 18, 2020
Decided: June 29, 2021

*Defendant's Amended Motion for Postconviction Relief* **– DENIED**

*Defendant's Motion for an Evidentiary Hearing* **– DENIED**

# **OPINION**

Allison Abessinio and Erika Flaschner, Deputy Attorneys General, Department of Justice, Wilmington, Delaware. *Attorneys for the State*.

Natalie Woloshin, Esquire of Woloshin, Lynch and Associates, Wilmington, Delaware. *Attorney for the Defendant*.

**STREETT, J.**

On September 18, 2020, John Tucker (the "Defendant"), through his attorney,[1] filed an Amended Motion for Postconviction Relief,[2] an Appendix, and a Motion for an Evidentiary Hearing, pursuant to Delaware Superior Court Criminal Rule 61.

The chronology of this case is that:

- On September 9, 2016, Joshua Moore (the "Victim") was severely beaten by two men and left bleeding on the ground in an alley.
- On September 9, 2016, within minutes of arrival at the scene, the police arrested Defendant for assault as he and two others walked away.
- On November 21, 2016, Defendant was indicted on the charges of Assault First Degree, Possession of a Deadly Weapon during the Commission of a Felony, and Conspiracy Second Degree.[3]
- On May 16, 2017, a jury trial began.
- On May 24, 2017, the jury convicted Defendant of all charges.
- On September 15, 2017, Defendant was sentenced to a total of twenty-seven years at Level V incarceration, suspended after fifteen years for decreasing levels of supervision.
- On November 8, 2017, Defendant filed a Notice of Appeal.
- On July 17, 2018, the Delaware Supreme Court affirmed Defendant's conviction and issued its mandate on August 6, 2018.[4]
- On December 28, 2018, Defendant filed a *pro se* Motion for Postconviction Relief and a Motion for the Appointment of an Attorney.
- On September 18, 2020, Defendant, through his appointed attorney, filed this Amended Motion for Postconviction Relief and Appendix alleging ineffective assistance of counsel. A Motion for an Evidentiary Hearing was also filed.
- On September 18, 2020, Rule 61 Counsel also filed a Motion to Compel Discovery which was withdrawn on February 5, 2021.[5]

---

[1] Natalie Woloshin, Esq. was appointed as Rule 61 Counsel.

[2] Defendant had filed a *pro se* Motion for Postconviction Relief on December 28, 2018.

[3] A co-conspirator was never arrested or indicted.

[4] *Tucker v. State*, 2018 WL3434557 (Del. July 16, 2018).

[5] Rule 61 Counsel sought evidence seized from Ms. Genai Shockley-Stevens (one of the two people walking with Defendant) and a copy of her April 10, 2017 guilty plea. Based on items contained in the Rule 61 Appendix, it would appear as though the State turned those items over to Rule 61 Counsel without a Court order.

- On January 29, 2021, Trial Counsel filed an Affidavit in Response to Defendant's Amended Motion for Postconviction Relief.[6]
- On March 3, 2021, the State filed its Response to the Amended Motion for Postconviction Relief.

After a full, thorough, and careful *de novo* review of the record, Defendant's Motions are **DENIED**. Defendant had a trial that spanned several days and was vigorously defended by Trial Counsel. Eyewitnesses observed two men brutally beat a third man who sustained permanent brain damage. The jury heard the testimony of several police officers, a DNA expert, the victim, the victim's mother, a nurse, two eyewitnesses who were Defendant's neighbors, the mother of Defendant's baby, Defendant's foster brother, and the Defendant.

The facts of the case, as elicited at trial, are that on September 9, 2016, shortly after 11 p.m., eyewitnesses from different households heard noises in the alley behind their residences in the unit block of East 31st Street in Wilmington. The neighbors looked outside and saw a beating in progress.[7] They observed two men attacking another man with their fists and a metal stick.[8] The alley was not a high

---

[6] Raymond Armstrong, Esq. represented Defendant at trial ("Trial Counsel").

[7] May 17, 2017 Tr. at 61.

[8] May 18, 2017 Tr. at 103.

crime area and the neighbors immediately called the police.[9] The victim was balled up in a fetal position on the ground, did not get up, and was not moving.[10]

The beating continued for approximately five minutes until one of the neighbors yelled, "Yo. Whatcha all doing?" The assailants then stopped and ran away.[11] One of them ran toward the alley entrance to his apartment; the other man ran toward Jessup Street. Defendant's next-door neighbor later identified Defendant that night, in a photo lineup at police headquarters, as the assailant who had fled to his (Defendant's) apartment entrance.[12]

When the assailants fled, several neighbors then went to the person on the ground in the alley and saw that he could not get up, was barely conscious, and was having difficulty breathing as he lay in a pool of blood with bruises on his body.

The police quickly arrived and were informed that three people were walking toward Jessup Street. Cpl. Michael Coleman noticed three people (two men and a woman who was pushing a baby stroller[13]) walking out of the alley. He did not

---

[9] *Id.* at 63. Corporal Michael Coleman said he had "never made an arrest or even stopped anybody in that alleyway…there is a daycare right there."

[10] May 18, 2017 Tr. at 93.

[11] May 18, 2017 Tr. at 94.

[12] *Id.* at 98; May 22, 2017 Tr. at 13.

[13] The woman was later identified as Ms. Genai Stephens-Shockley.

attempt to stop them because his attention was drawn to the bloody victim.[14] Cpl. Coleman testified that there was so much blood at the scene that he "did not know whether the victim had been shot or stabbed."[15]

The victim (subsequently identified as Joshua Moore), was unresponsive and had difficulty catching his breath.[16] He was immediately transported to the hospital and put on a ventilator. He had a subdural hematoma on each side of his brain and suffered irreparable nerve damage.[17] Moore spent four months in the hospital and was then sent to a rehabilitation center for a period of time to relearn how to walk and eat.[18] He now lives with his mother because he is unable to live alone.[19]

Corporal Johnny Saunders also arrived near the scene within a few minutes of the 911 calls. He saw three people walking near 29th and Jessup Street.[20] There were no other people on the street.[21] One of them (the Defendant) was talking on a

---

[14] May 17, 2017 Tr. at 53.

[15] May 18, 2017 Tr. at 52.

[16] *Id.*

[17] *Id.* at 201-03.

[18] *Id.* at 211.

[19] May 19, 2017 Tr. at 19.

[20] May 17, 2017 Tr. at 99.

[21] *Id.* at 76.

cellphone and had a tan canvas belt partially held in his hand and partially inserted into one or two loops of his waistband. Cpl. Sanders detained the Defendant, drove him by the scene, and then took him to police headquarters. Defendant was advised of his *Miranda* rights.[22] Defendant denied knowing anything about a fight; he said that he went inside his apartment and then came back out to meet a girl.[23] He later said that Moore had surprised him in the alley and attacked him.

The police observed fresh cuts on Defendant's arm and wet, fresh blood stains on the canvas belt. After Defendant was told that he could not wash his hands in the bathroom, the police observed Defendant repeatedly lick and spit on his hands and then attempt to wipe stains from his shoes.[24]

Subsequent DNA testing of the stains on the belt and on a part of a grill that had been stuffed into a trash bin near the attack[25] revealed that the stains contained the victim's DNA. Although the stains on the canvas belt were no longer visible on

---

[22] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[23] May 22, 2017 Tr. at 117.

[24] *Id.* at 118.

[25] May 18, 2017 Tr. at 25.

the day of trial (which was more than a year after the beating), the officer testified on cross-examination that the blood stains may have faded.[26]

Trial testimony also revealed that Defendant and the victim were acquaintances. They were both Ms. Kanisha Poole's former boyfriends, were aware of each other, and they lived in different neighborhoods. Ms. Poole testified that Defendant was her baby's father (their romantic relationship had ended in 2015) and Moore had been her boyfriend until a few days before he was the victim of the beatdown in the alley.[27] She said that Defendant had a temper[28] but there was no animosity between Defendant and Moore despite a verbal argument several months before the beating. Ms. Poole testified that, on the night of the attack, she drove Defendant (and his foster brother) to East 31st Street without incident and saw an unidentified man running near her car immediately after she dropped off Defendant near his apartment. She then drove away and took the foster brother to his house on the other side of town.

Defendant testified that he was attacked in the alley by Moore as he tried to enter his (Defendant's) apartment. Defendant said that he fought with Moore in self-

---

[26] May 18, 2017 Tr. at. 25. Also, Det. Randall Newell testified that he had taken a photograph of the canvas belt on his cellphone. *Id.* at 53. The Defense sought a mistrial because the State had not disclosed this information. This issue was the subject of Defendant's unsuccessful appeal.

[27] Defendant seemingly did not know that she was no longer romantically involved with the victim.

[28] May 22, 2017 Tr. at 69.

7

defense. He explained that he was driving Ms. Poole's vehicle with Shaquan Guilford (his foster brother) as his passenger on the night of the incident. They picked up Ms. Poole from her job at approximately 10:45 p.m. and Ms. Poole then drove them to East 31st Street near Defendant's apartment around 11:00 p.m. Defendant said that he exited the vehicle and Ms. Poole immediately drove away to take Guilford to his house.

Defendant testified that he saw an unidentified man walk in front of Ms. Poole's vehicle as he exited the car. When he approached his apartment entrance, which was in a dark alley in the back, he heard a man say "Don't run, bitch. your baby mama set you up."[29] He saw that it was Moore and watched Moore reach into his pants. Defendant ran toward his doorway because he thought that Moore was about to pull out a gun. Moore, however, charged at him and hit him in the head. Defendant said that he fought back in self-defense.[30] They wrestled until they fell into Defendant's apartment door and tussled outside of the house.[31]

---

[29] May 22, 2017 at 106.

[30] Over the State's objection, the Defendant's outburst during his preliminary hearing that he (Defendant) "whooped [Moore's] ass because he ran down on me" (Prel. Hr'g Tr. at 14, Sept. 23, 2016) was entered into evidence.

[31] May 22, 2017 Tr. at 107.

8

Defendant further said that Mark Rollins and Ms. Stephens-Shockley[32] were inside his apartment as he wrestled with Moore in the doorway. Rollins was Defendant's close friend and Ms. Stephens-Shockley was the mother of Rollins' baby. Rollins intervened; Moore released Defendant; and Moore then started fighting with Rollins. Once released, Defendant ran down Jessup Street[33] and immediately called Guilford to warn him that he thought Ms. Poole had set them up.

Defendant testified that he told the police that he did not know that there had been a fight but later said that he fought Moore in self-defense.[34] The police did not find a gun at the scene.[35] They did not find a gun anywhere else, either.

Guilford testified that he received a call from Defendant just as Ms. Poole dropped him off at his house on the other side of town. The call was from the Defendant who was yelling that Ms. Poole had set them up. Guilford confronted Ms. Poole but she responded by smiling and driving away.

Defendant's Amended Motion for Postconviction Relief alleges ineffective assistance of counsel. Rule 61 Counsel asserts that Defendant was prejudiced because there was no testimony at trial about Ms. Stephens-Shockley or a black

---

[32] Both sides have repeatedly transposed her names.

[33] *Id.* at 107.

[34] May 22, 2017 Tr. at 117-18.

[35] *Id*. at 83.

(possibly leather) belt found in her purse. The Defense also argues that Ms. Stephens-Shockley should have been called as a witness and that Trial Counsel failed to fully investigate the case.

Defendant's claims are primarily based on information and a transcript that were not part of the trial evidence.[36] Those documents consist of police reports, a transcript of an undisclosed statement given by Ms. Stephens-Shockley to Det. Nowell, and Ms. Stephens-Shockley's April 2016 guilty plea of lying to the police.[37]

Specifically, Rule 61 Counsel relies on a report made by Wilmington Police Officer DiRocco[38] who stopped Ms. Stephens-Shockley at 28th and Jessup Streets as she was pushing the baby stroller on the night of the incident.[39] Officer DiRocco transported her to police headquarters and she was advised of her *Miranda* rights[40]. According to Officer DiRocco's report, Ms. Stephens-Shockley denied knowledge of the assault and denied knowing Mark Rollins despite having a pill bottle with his name on it in her purse. Officer DiRocco also found a belt in her purse which she

---

[36] The information about Ms. Stephens-Shockley was contained in several undisclosed police reports, were not offered into evidence at trial by the State, and appear to have been provided only after Rule 61 Counsel filed its Motion for Evidence.

[37] The Defense supplied them in the Appendix to the Amended Motion.

[38] Officer DiRocco did not testify and his first name does not appear in the record.

[39] The third person has never been identified.

[40] *Miranda v. Arizona*, 384 U.S. at 436 (1966).

10

claimed was found in the street.[41] The belt, which was dark or black, was not made of canvas. It was seized but not tested for DNA.

Defendant posits that this second belt had an "apparent" blood stain and that the introduction of this dark belt would have tended to exculpate the Defendant. Rule 61 Counsel asserts that Trial Counsel should have "use[d] that belt in trial to advance and corroborate Mr. Tucker's defense."[42] Rule 61 Counsel adds that it is "confounding" that Trial Counsel did not use the second belt to challenge chain of custody, undermine the integrity of the police investigation, or bolster the self-defense claim.[43]

The Defense also cites a report by Detective Rodney Newell, the chief investigating officer, concerning a second interview with Ms. Stephens-Shockley on October 12, 2016. Although the State called Detective Newell as a trial witness, there was no mention of Ms. Stephens-Shockley during the trial.[44] Rule 61 Counsel faults Trial Counsel for not attempting to gain an advantage from the fact that Ms. Stephens-Shockley had given a second story to the police, changed her story,

---

[41] Ms. Stephens-Shockley's father arrived at the station and took the baby home. She was released later that morning.

[42] Def.'s Amended Mot. at 22.

[43] Def.'s Amended Mot. at 20-24.

[44] The State did not ask the detective about Ms. Stephens-Shockley, Trial Counsel did not cross-examine him about her, and Trial Counsel did not call her as a witness.

acknowledged that Rollins was her baby's father, had been prosecuted for giving a false statement, and pled guilty to lying to the police.[45] Rule 61 Counsel alleges that Trial Counsel failed to investigate Ms. Stephens-Shockley and should have called her as a witness to corroborate Mr. Tucker's claim of self-defense.

Rule 61 Counsel also asserts that Ms. Stephens-Shockley's testimony "would have offered an alternate, credible theory as to who inflicted the most serious injuries upon the victim."[46] Defendant claims that "had Trial Counsel introduced information related to Ms. Stephens-Shockley and Rollins at trial, there is a reasonable probability that the result of the proceeding would have been different".[47] Additionally, Rule 61 Counsel argues that "Trial counsel's failure to investigate which belt [ ] was tested for DNA and used at trial cause[d] significant prejudice to Tucker's defense." Rule 61 Counsel also requests an evidentiary hearing.[48]

On January 29, 2021, Trial Counsel submitted an Affidavit in response to Defendant's allegations. Trial Counsel denies the claims.

---

[45] Ms. Stephens-Shockley was arrested in October 2016 and pled guilty to Providing a False Statement to Police on April 10, 2017.

[46] *Id*. at 29.

[47] *Id*. at 30-31.

[48] *Id*. at 18.

As to the issue of the belt, Trial Counsel wrote that he had examined all of the evidence and photos provided by the State and was aware of the black belt.[49] He wrote that he made a strategic decision that the Defense would not use that belt at trial.

Trial Counsel explained that he did not want to introduce a second belt because it might have undermined Defendant's claim of self-defense. Moreover, its origin was unknown, he did not want the jury to conclude that the second belt was used as a weapon, and he did not want the jury to think that the Defendant had removed the belt. Additionally, in view of the fact that the victim was found naked with his pants down around his ankles, he "did not want to take the chance that the second belt would serve as the State's proof that either Mr. Tucker or Mr. Rollins [had] stripped the State's victim naked as an effort to humiliate him."[50]

Concerning Ms. Stephens-Shockley, he explained that he was aware of her and the statement that she gave on the night of the incident; however, the State had not informed him of or disclosed a second (contradictory) statement or that she had entered a guilty plea for lying to the police.

---

[49] The record indicates that more than 111 photos, several DVDs, numerous police reports, the DNA lab report, the victim's medical records, and search warrant applications were provided to the defense pretrial.

[50] Trial Counsel's Response at 5.

Furthermore, even though Trial Counsel had incomplete information about Ms. Stephens-Shockley, the Defense attempted to interview her as part of its investigation. However, she refused to cooperate with the defense investigator. As such, Trial Counsel did not know whether she would help or hurt the Defense if called to testify (particularly since she was Rollins' girlfriend).

Trial Counsel explained that his policy is to not call anyone as a witness unless he knows what that person will say. Thus, it was Trial Counsel's strategy, "as approved by Mr. Tucker,"[51] to focus on Ms. Poole's animosity toward Defendant that was manifested by a scheme to use Moore to harm Defendant and that Defendant only engaged in the altercation in order to defend himself from Moore's aggression. He also wanted to show that any DNA found was the inevitable result of the altercation. Trial Counsel also wrote that he wanted to "downplay the involvement or intervention of any 3rd party"[52] and did not want the jury to think that Defendant joined with someone else to exact revenge for Moore's attack.

Trial Counsel reasoned that Defendant's self-defense claim was "locked [due to his] previous statements to the police and his outburst at the preliminary hearing."[53] Hence, Trial Counsel did not want to draw attention to another belt

---

[51] *Id.* at 2.

[52] *Id.*

[53] *Id.* at 4.

because it would undermine that claim. Furthermore, Trial Counsel wanted to cast doubt on the quality of the police investigation and the fact that the belt in evidence did not have any visible blood stains.

The State, in its Response, argues that Defendant's claims lack merit. The State writes that there was extensive evidence pointing to Defendant's guilt. Defendant, who was known to one of the eyewitnesses, was seen beating the victim and fifteen minutes later was caught holding a belt that was stained with the victim's blood.

The State asserts that the Defendant has mischaracterized the evidence, placed undue weight on the importance of the black belt, and that "Defendant cannot demonstrate that introducing the existence of a second belt would have resulted in an outright exclusion of Defendant's belt from trial".[54] The State also writes that Defendant has not suffered any prejudice.

Before considering the merits of any claims asserted in a motion for postconviction relief, the Court must first determine if the motion is procedurally barred under Superior Court Criminal Rule 61.[55]

---

[54] State's Response at 16.

[55] Superior Court Criminal Rule 61(i) provides, in pertinent part:
Bars to relief.
    (1)    Time limitation. A motion for postconviction relief may not be filed more than one year after the judgment of conviction is final or, if it asserts a retroactively applicable right that is newly recognized after the judgment of conviction is

15

Defendant's motion is timely, having been filed within one year after his judgment of conviction became final, is not repetitive, and was not previously adjudicated. There are no procedural bars to Defendant's Motion.

However, in the instant case, an analysis of the law concerning attorney performance leads to the conclusion that Trial Counsel did not fall below normal standards.

A defendant must do more than simply claim that his counsel was ineffective. The defendant must show that counsel's alleged "errors were so grievous that his performance fell below an objective standard of reasonableness . . . [and] there is a reasonable degree of probability that but for counsel's unprofessional errors the outcome of the proceedings would have been different." [56]

---

final, more than one year after the right is first recognized by the Supreme Court of Delaware or by the United States Supreme Court.

\* \* \* \*

(3) Procedural Default. Any ground for relief that was not asserted in the proceedings leading to the judgment of conviction, as required by the rules of this court, is thereafter barred, unless the movant shows

(A) Cause for relief from the procedural default and
(B) Prejudice from violation of the movant's rights

Also, a meritorious ineffective assistance of counsel claim that demonstrates a constitutional violation may be considered an exception under Rule 61(i)(5). *State v. Flowers,* 150 A. 3d 276, 282 (2016).

[56] *State v. Gattis*, 1995 WL 790961, at \*4 (Del. Super. Dec. 28, 1995) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984)). *See also Harrington v. Richter*, 562 U.S. 86, 104 (2011); *Premo v. Moore*, 562 U.S. 115, 121 (2011); *Scott v. State*, 7 A.3d 471, 475-76 (Del. 2010); *Duross v. State*, 494 A.2d 1265, 1268 (Del. 1985).

The law is clear that there is a strong presumption that counsel's representation is competent and falls within the "wide range" of reasonable professional assistance.[57] Moreover, deference must be given to counsel's judgment in order to promote stability in the trial process.[58]

Furthermore, to overcome the strong presumption that counsel has acted competently, the defendant must demonstrate that "counsel failed to act reasonabl[y] considering all the circumstances" and that the allegedly unreasonable performance prejudiced the defense.[59] The issue is not whether counsel deviated from the best or most common practice but whether counsel's representation was inadequate under the "prevailing professional norms."[60] Thus, the essential question is whether counsel made mistakes so crucial that counsel was not functioning at the level guaranteed by the Sixth Amendment and deprived the defendant of a fair trial.[61]

In the instant case, the Court does not find that the performance of Trial Counsel was substandard, does not find that Defendant was prejudiced or prevented from having a fair trial, and does not find that any alleged errors of Trial Counsel

---

[57] *Premo*, 562 U.S. at 121.

[58] *Id.* at 125.

[59] *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 688).

[60] *Harrington*, 562 U.S. at 105.

[61] *Id.* at 104.

weakened Defendant's appeal. An analysis of the record reflects that Trial Counsel's representation was not unreasonable, did not fall below objective standards, and did not prejudice Defendant's case.

Concerning the black belt, Rule 61 Counsel alleges that the introduction of that belt would have created a reasonable probability that the Defendant would have been acquitted by the jury. Defendant posits that it would have placed suspicion on Mark Rollins, supported Defendant's self-defense claim, and suggested that the blood-stained tan canvas belt found on Defendant had not been involved in the incident.

Defendant's argument is unpersuasive and distracts from the evidence. The case against Defendant was overwhelming, with or without one or more belts in evidence. Defendant was indicted and convicted of beating Moore using a grill cover as a weapon while acting with an accomplice.

Moreover, the testimony clearly showed that the police had not confused the tan canvas belt with the black belt[62]; the transcript reflects that Rule 61 Counsel's assertion that the victim's DNA was on the black belt is conjecture; and Trial Counsel did not think that it was a good strategy to have the jury consider whether

---

[62] Furthermore, contrary to Rule 61 Counsel's comment that the black belt "seems to have vanished" (Def.'s Amended Mot. at 22), Trial Counsel was aware of the black belt and it does not appear as though the black belt has been misplaced.

the black belt possibly belonged to or was used either by Defendant or an accomplice. Trial Counsel wanted to focus on self-defense and sloppy police work.

Although the blood-stained tan canvas belt that Defendant held was placed into evidence, the second count of the indictment was Possession of a Deadly Weapon during the Commission of a Felony – a grill cover used as a bludgeon.[63] Unimpeached eyewitnesses watched as the assailants beat their victim with a metal object, a grill was found in a bin near the helpless victim, the grill cover was found to have the victim's DNA on it, and Defendant was positively identified by his neighbor as one of the men who participated in the beatdown. Rule 61 Counsel has not shown that introduction of the black belt at trial could negate the DNA on the grill cover, discredit the testimony that Defendant's next-door neighbors watched a vicious beating, that Moore was struck with something metal (clearly not a canvas belt or a leather belt), that Defendant's next-door neighbor watched him leave the attack, or that his neighbor identified him later that night at police headquarters.

---

[63] 11 *Del. C.* § 1447(a) states that "A person who is in possession of a deadly weapon during the commission of a felony is guilty of possession of a deadly weapon during the commission of a felony."

11 *Del. C.* § 222 defines a deadly weapon, in pertinent part:
(5) "Deadly weapon" includes…[a] bludgeon…or any "dangerous instrument"…which is used…to cause…serious physical injury.

The same section of the code defines a "dangerous instrument", in pertinent part:
(4) "Dangerous instrument" means any instrument, article or substance which, under the circumstances in which it is used,…is readily capable of causing death or serious physical injury….

19

Furthermore, although Rule 61 Counsel suggests that introduction of the black belt would raise a chain of custody issue, the record shows that Trial Counsel had already raised that issue during trial as part of his strategy to cast doubt on the police.

Additionally, the testimony as to the tan canvas belt was straightforward. The police did not confuse the tan belt with any other belt and the blood stains had faded due to the passage of time. The police testified that normal protocols for storage, DNA testing, and presentation were followed. So too, there is nothing in the record to suggest that there were two tan canvas belts, that the police had difficulty distinguishing a tan canvas belt from a black non-canvas (possibly leather) belt, or that there was an intentional or unintentional substitution of one belt for another when sent for DNA analysis.

Defendant also posits that Trial Counsel should have further investigated and/or put the black belt into evidence because it would have shifted blame to Rollins and that the black belt had "apparent" blood on it based on the detective's comments to Ms. Stephens-Shockley upon finding the black belt in her purse. However, Defendant's extrapolation from the detective's comments is misplaced.

The evidence is clear that two men beat Moore. The evidence is also clear that a neighbor identified Defendant as a participant in the beating and Defendant was indicted for being part of a conspiracy. Rule 61 Counsel has not shown that

blaming Rollins (who was not arrested or indicted) would prompt the jury to acquit Defendant of conspiracy, assault, or the weapons charge.

So too, Rule 61 Counsel's interpretation of a detective's conversation with Ms. Stephens-Shockley about the belt is faulty. Ms. Stephens-Shockley was detained by the police within minutes of the beating as she walked near Defendant and pushed the baby stroller. Det. Nowell had a lengthy exchange with Ms. Stephens-Shockley about her purse, a belt found in the purse, a bookbag, prescription bottles, and a cell phone.  The following are portions of that exchange:

Detective: Whose belt is in your purse?
Shockley: That's mine.
Detective: Looks like a man's belt.
Shockley: I got it from a guy.
     \*  \*  \*
Shockley:  It's. Okay. The belt's not mine.
Detective: Whose  - whose -  whose belt is it?
Shockley: I found it.
Detective: Where did you find it?
Shockley: On the ground.
     \*  \*  \*
Shockley: I found the belt and as I picked it up.
Detective: Hm.
Shockley: That was stupid, wasn't it?
Detective: Yeah. Because the issue is, um, that the belt has what we think is going to be blood on it.
Shockley: Really?
Detective: Yeah. And that blood is going to match the victim's blood from this assault that I've been talking about…
     \*  \*  \*
Detective:  …Um.  We talked about that belt?
     \*  \*  \*
Detective: Okay.  Um.  And you said you picked it up where again?
Shockley:  On Market Street.

Detective: Market Street? Okay. You mind if I – I keep the belt? It could be important to this assault case.
Shockley: (shrugs) I don't care.[64]

The transcript reflects that the detective raised the possibility of blood and DNA in an effort to extract a coherent story from a reluctant witness. Contrary to Defendant's assertion, the detective did not affirmatively state that there actually was blood on the black belt. As such, declaring that the black belt "had what appeared to be blood on it from a person who was purportedly at the scene…"[65] and that "there was a belt in police custody which had apparent blood on it collected from Stephens-Shockley…"[66] is taking the detective's words out of context.

The transcript shows that Ms. Stephens-Shockley was evasive and contradictory as the detective attempted to persuade Ms. Stephens-Shockley to talk about the events of that evening. He presented his suspicions to her and what might possibly be found on the belt. He told her that he *thought* that there would be blood on the belt. He then expanded on that idea and projected that it would match the victim's blood. After that tactic was unavailing, he commented that the belt might be of potential value because it *could* be important to the assault investigation.[67] The

---

[64] Def's Appendix at A083-A087.

[65] Def.'s Amended Mot. at 22.

[66] *Id.*

[67] Emphasis supplied.

22

officer used coercive tactics on an individual who had given evasive and inconsistent responses. Suggestions, suspicions, and projections are not facts.[68] The detective's attempt to get coherent and potentially incriminating information from someone caught leaving the scene of a crime do not support a claim of ineffective assistance of counsel.

As to the Assault First Degree charge, Rule 61 Counsel's argument that the introduction of a second belt (with or without bloodstains) would have resulted in a different verdict is speculative. The State's case was strong. Moreover, a belt was not the defining issue or weapon in this prosecution. Defendant has not shown that evidence of a second belt would have mitigated the force that caused Moore's permanent brain damage, uncoupled Defendant from a Conspiracy charge, or avoided Defendant's Assault in the First Degree conviction.[69]

Furthermore, there was no evidence that Moore had a belt and the source of the black belt remains unknown. As such, irrespective of who had the black belt (Defendant, Rollins, Ms. Stephens-Shockley, or an unknown person), suggesting to the jury that the victim's blood might also have been on a second belt (especially since it had not been analyzed) would not inure to Defendant's benefit.

---

[68] The officer's comments are unsupported and unverifiable. The black belt was never sent for DNA testing.

[69] 11 *Del. C.* §613(a) states that a person is guilty of assault in the first degree when:
    (1) The person intentionally causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument.

Here, Defendant was "locked" into a claim that he "whooped [Moore's] ass" because Moore was the aggressor. Defendant could not logically recant his self-defense claim. However, the evidence reflects that the incident in the alley went beyond a mere self-protective fistfight or tussle. The evidence showed that Defendant participated with another in a vicious beating of an unarmed person who was huddled on the ground, the person on the ground was not a threat to Defendant, and Defendant had an opportunity to retreat (and, in fact, Defendant and his accomplice disengaged without difficulty from the attack when a neighbor yelled at them and it became clear that they were being watched).[70]

Under the circumstances, the degree of force in the alley and the use of a bludgeon were unjustified. While a person might be justified in using force in self-defense to protect himself or another against the use of unlawful force by another person, there is no evidence that Moore used unlawful force. Moreover, although Defendant claimed that he thought Moore had a gun, there is no evidence that a gun was involved. Here, Defendant was arrested and prosecuted for the use of deadly

---

[70] 11 *Del. C.* §464 states, in pertinent part, that the use of deadly force is not justifiable…if:
  (e)(2) The defendant knows that the necessity of using deadly force can be avoided with complete safety       by retreating…
     [although] (a) the defendant is not obliged to retreat in or from the defendant's dwelling; and
        (b) the defendant is not obliged to retreat in or from the defendant's place of work, unless the
          defendant was the initial aggressor

24

force which is unjustified when deadly force is not necessary to protect against the threat of death or serious injury by another person. Whatever may have initially occurred evidently progressed to the alley where two eyewitnesses watched for five minutes as Defendant and another person beat Moore with an object into semi-consciousness and permanent brain damage.

Furthermore, deadly force is not justifiable when a defendant is outside of his dwelling if the necessity for using deadly force could have been avoided with complete safety by retreating. Here, Defendant was outside of his dwelling and had the opportunity to retreat. His semi-conscious victim lay in a fetal position in a pool of blood on the ground in an alley, was not a threat to Defendant, could not have harmed Defendant, and could not have prevented Defendant from retreating. Defendant had ample time and opportunity to retreat, which he easily did when his neighbor yelled at them. Under the circumstances, a second belt would not change the fact that eyewitnesses watched a five-minute beatdown of a person who lay on the ground and was barely breathing. The second belt would not acquit Defendant of the assault first degree charge.

As to the conspiracy count in the indictment, whether or not the Defendant was alone when the incident began, Defendant was not alone as events ensued.

Eyewitnesses came out of their houses, observed a beating in progress, and testified that they watched two men as they, together, beat the victim for five minutes.[71]

Thus, irrespective of how the encounter began, Defendant acted with another. Placing an additional, dissimilar, and untested belt into evidence would not exculpate the Defendant from the conspiracy charge (particularly since Defendant testified that Rollins was also fighting Moore) or accomplice liability. So too, Defendant's suggestion of accomplice self-defense does not justify the deadly force possibly used by the accomplice. Thus, the decision to not introduce an additional, dissimilar, and untested belt of unknown origin was not unreasonable and did not cause prejudice.

Furthermore, Trial Counsel explained that it was his conscious choice to not introduce a second belt at trial. Trial Counsel did not want the jury to think that two belts might have been used to brutalize the victim, publicly humiliate him, or cause permanent brain damage. Moreover, he did not want to risk the jury concluding that the two belts indicated calculated behavior, contradicted Defendant's claim of surprise and self-defense, or cast doubt on Defendant's credibility. This was part of Trial Counsel's strategy.

---

[71] 11 *Del. C.* §512 defines Conspiracy Second Degree, in pertinent part, as:

A person is guilty of conspiracy in the second degree when, intending to promote or facilitate the commission of a felony, the person:

(2) Agrees to aid another person…in the commission of the felony…; and the person or another person with whom the person conspired commits an overt act in pursuance of the conspiracy.

Rule 61 Counsel's other ground for asserting ineffective assistance of counsel concerned the fact that Ms. Stephens-Shockley did not testify. The Defense posits that putting a convicted liar on the witness stand would somehow make the Defendant more credible. Defendant argues that if Ms. Stephens-Shockley testified, she would have been exposed as a woman who was trying to protect her boyfriend (Rollins) and that would have been helpful to the Defense. Rule 61 Counsel has not shown how a lying girlfriend could extricate Defendant from his participation with another in a beating that was witnessed by his neighbors.

Furthermore, at the time of trial, the State had not disclosed to the Defense that Ms. Stephens-Shockley had given a second, contradictory statement or that she had been convicted of lying.[72] Indeed, Rule 61 Counsel's request for a court order appears to have been the impetus for this post-trial disclosure. As such, Trial Counsel could not consider information that he did not have because it had been withheld from him.

Furthermore, Trial Counsel's attempt to investigate Ms. Stephens-Shockley or her version of events was thwarted by her refusal to cooperate with a defense investigator.[73] Thus, without disclosure from the State or the cooperation of Ms.

---

[72] During trial, it was also revealed that the State had not told the defense that an officer had a cellphone photo of the blood-stained tan canvas belt.

[73] Trial Counsel had sent an investigator to speak with Ms. Stephens-Shockley but she would not speak with him.

Stephens-Shockley, Trial Counsel was only aware of her first statement and that she had a black belt in her purse while leaving the area with Defendant and another. Her second statement and guilty plea were only revealed after trial and, as such, could not have been a factor in Trial Counsel's consideration or decision concerning whether to call her as a witness, and, in hindsight, they were unlikely to be helpful.

Trial Counsel explained that his general policy was to present someone as a defense witness only if he can be certain that the witness would be beneficial to the Defense. Here, he did not know what she would say on the witness stand, whether her testimony would be helpful, or whether she would try to protect herself and/or Rollins by shifting blame to the Defendant. Contrary to Rule 61 Counsel's claim that her testimony "would have offered an alternate, credible theory as to who inflicted the most serious injuries upon the victim"[74], the issue was not comparative injuries inflicted by co-conspirators. Furthermore, Ms. Stephens-Shockley's testimony might have weakened Defendant's self-defense strategy. Trial Counsel did not want to risk jury rejection of her credibility spilling over into rejection of Defendant's self-defense claim. Trial Counsel's belief that it would have been imprudent to call her as a Defense witness was not unreasonable.

---

[74] Def's Amended Mot. at 29.

Upon consideration of Defendant's ineffective assistance of counsel claims, the Court does not find that there was ineffective assistance of counsel or that the performance of Trial Counsel was substandard. The Court also does not find that Defendant was prejudiced or prevented from having a fair trial. An analysis of the law concerning attorney performance leads to the conclusion that Defendant's trial was fair, the jury reached its verdict after considering all of the evidence, and representation by Trial Counsel was not unreasonable.

The record reflects that Defendant and Trial Counsel were able to communicate during months of trial preparation; Defendant was competent for trial; and Defendant chose to testify at trial after discussion with his attorney. The record also shows that Trial Counsel reviewed the evidence provided by the State and made a diligent effort to investigate the case. It is also clear that Trial Counsel acted responsibly during trial, presented a trial strategy, cross-examined the State's witnesses, questioned the value of certain State's evidence, and vigorously defended his client.

In order for a defendant to establish ineffective assistance of counsel, the defendant must satisfy the two-pronged standard created by the U.S. Supreme Court in *Strickland v. Washington*,[75] "which requires that he prove that trial counsel's

---

[75] *Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

performance was objectively unreasonable and that the defendant was prejudiced as a result."[76] The Delaware Supreme Court held that:

> Under the first prong, judicial scrutiny is highly deferential. Courts must ignore the distorting effects of hindsight and proceed with a strong presumption that counsel's conduct was reasonable. Under the second prong, [a defendant] must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Thus, [a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.[77]

Moreover, "A defendant asserting a claim of ineffective assistance of counsel is required to make concrete allegations of cause and actual prejudice or risk summary dismissal of the claim."[78] There is a strong presumption that counsel's representation is competent and falls within the "wide range" of reasonable professional assistance.[79] As such, deference must be given to counsel's judgment in order to promote stability in the process.[80]

---

[76] *Rodriguez v. State*, 109 A.3d 1075, 1079 (Del. Jan. 29, 2015).

[77] *Id.* at 1079 (internal quotation marks omitted). *See also Scott*, 7 A.3d at 475-76; *Zebroski v. State*, 822 A.2d 1038, 1043 (Del. 2003); *Duross*, 494 A.2d at 1268–69 (Del. 1985); *State v. Slade*, 2002 WL 1974023, at *4 (Del. Super. Aug. 14, 2002); *Strickland*, 466 U.S. at 668 (1984); *Harrington*, 562 U.S. at 104; *Premo*, 562 U.S. at 121.

[78] *Winn v. State*, 2005 WL 3357513, at *1 (Del. Dec. 8, 2005).

[79] *Premo,* 562 U.S. at 121.

[80] *Id.* at 125-26.

Furthermore, in order to show prejudice, the defendant must prove that, but for counsel's errors, the result would have been different.[81] The Court does not need to be certain that counsel's performance had no effect on the outcome.[82] However, there must be a substantial probability that there would have been a different result.[83] The test calls for the defendant to "make specific and concrete allegations of actual prejudice and substantiate them."[84]

Here, Trial Counsel's performance was not substandard, did not fall below an "objective standard of reasonableness", and there was no prejudice to the Defense.[85] Defendant's Amended Motion lacks a factual basis, is contradicted by the record, and speculates as to the usefulness of such desired testimony. Trial Counsel was an active and engaged advocate. Pretrial, he communicated well with his client, investigated the charges, and considered the probative value of the State's discovery. At trial, counsel vigorously cross-examined and challenged the State's witnesses and evidence, raised issues of doubt, and made numerous objections concerning the presentation of the State's case. Trial Counsel also presented several defense

---

[81] *Cullen*, 563 U.S. at 189 (citing *Strickland*, 466 U.S. at 694).

[82] *Harrington*, 562 U.S. at 111-12 (citations omitted).

[83] *Id.*

[84] *Scott*, 7 A.3d at 476.

[85] *Strickland*, 466 U.S. at 687-88.

witnesses, discussed with Defendant whether he should testify, and made an impassioned closing argument.

Trial counsel's strategy was to develop and present the weaknesses in the State's case. He advanced several theories for acquittal, including self-defense, sloppy and unreliable police work, another assailant, and the absence of visible blood on the tan canvas belt. It is settled law that defense counsel is given wide latitude in making tactical decisions.[86]

Moreover, there is a "strong presumption that Trial Counsel's conduct constitutes sound trial strategy"[87] and the court may not insist that "counsel confirm every aspect of the strategic basis for his or her actions."[88] As such, the "distorting effects of hindsight"[89] should be eliminated and the court should not assume "sheer neglect."[90] Instead, the reviewing court should "reconstruct the circumstances of counsel's challenged conduct, and evaluate the conduct from counsel's perspective at the time."[91]

---

[86] *Harrington*, 562 U.S. at 106; *see also Flamer v. State,* 585 A.2d 736, 753-54 (Del. 1990).

[87] *Flowers*, 150 A.3d at 282 (citing *Strickland,* 466 U.S. at 689)).

[88] *Harrington,* 562 U.S. at 108.

[89] *Strickland,* 466 U.S. at 689.

[90] *Harrington,* 562 U.S. at 108 (citing *Yarborough v. Gentry,* 540 U.S. 1, 8 (2003) (*per curiam*)).

[91] *Flowers,* 150 A.3d at 288 (citing *Strickland,* 466 U.S. at 689).

Trial Counsel did not fail to conduct a reasonable investigation and "under the circumstances, the challenged action 'might be considered sound trial strategy'".[92] Moreover, the Defense has not shown "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"[93] or that confidence in the outcome of the case had been undermined.[94] Trial Counsel's assistance was not ineffective and there was no prejudice. Upon a full, thorough, and *de novo* review of the record, Defendant's Amended Motion for Postconviction Relief is **DENIED**.

As to Rule 61 Counsel's request for an evidentiary hearing, the law is clear that the Court has broad discretion when determining whether to hold an evidentiary hearing in connection with a postconviction motion.[95] After careful review of the record, the Court finds that the requested evidentiary hearing is not "desirable"[96] because it is not necessary for a thorough resolution of the issues raised in

---

[92] *Strickland,* 466 U.S. at 689.

[93] *Id.* at 694.

[94] *Ploof v. State,* 75 A.3d 840, 852 (Del. 2013).

[95] *State v. Jackson*, 2008 WL 5048424, at *33 (Del. Super. Nov.25, 2008).

[96] Del. Super. Crim. R. 61(h)(1).

Defendant's Amended Motion for Postconviction Relief[97] and Defendant's Motion for an Evidentiary Hearing is **DENIED.**

Accordingly, after a full, careful, thorough, and *de novo* review of the record and submissions, Defendant's Amended Motion for Postconviction Relief is **DENIED.** Defendant's Motion for an Evidentiary Hearing is **DENIED.**

**IT IS SO ORDERED.**

*/s/ Diane Clarke Streett*
Diane Clarke Streett, Judge

---

[97] *See Morla v. State*, 2008 WL 2809156, at *1 (Del. July 22, 2008) (affirming the trial court's determination that a hearing pursuant to Rule 61(h) was not necessary); *Washington v. State*, 2007 WL 4110636 (Del. Nov. 20, 2007) (holding that "it was within the Superior Court's discretion to decide his postconviction motion without an evidentiary hearing").